UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,                      Case No. 6:25-cv-

v.

Approximately 4,110,000 USDT previously associated
with the following unhosted virtual currency
address on the Ethereum blockchain:
0xcb567e89ac29ffb7adb85e8b4b8e7d7b14302f26,

     Defendant.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America brings this complaint and alleges upon

information and belief, in accordance with Rule G(2) of the Supplemental Rules for

Admiralty or Maritime Claims and Asset Forfeiture Actions, as follows:

## NATURE OF THE ACTION

1.    This is a civil action *in rem* to forfeit to the United States, pursuant to 18

U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 981(a)(1)(A), approximately 4,110,000 USDT

(the **Defendant Funds**) previously associated with the following unhosted virtual

currency addresses on the Ethereum blockchain:

0xcb567e89ac29ffb7adb85e8b4b8e7d7b14302f26 (the **Subject Address**).

2.    The **Defendant Funds** were seized on or about July 1, 2025, pursuant

to a Federal seizure warrant, after a finding of probable cause that the funds

constituted proceeds of a wire fraud scheme, in violation of 18 U.S.C. §§ 1343 and

1349, and property involved in money laundering offenses, in violation of 18 U.S.C.

§§ 1956(a)(1)(B)(i) and 1956(h).  Thus, the **Defendant Funds** are subject to civil

forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

3.      The **Defendant Funds** are currently in the custody of the United States

Secret Service.

## VENUE AND JURISDICTION

4.      Venue properly lies in the Middle District of Florida pursuant to 28

U.S.C. § 1395(b), because pertinent acts giving rise to the forfeiture action occurred

in the Middle District of Florida.

5.      The Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions

commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides

the Court with jurisdiction over actions to recover or enforce forfeitures.

6.      This Court has *in rem* jurisdiction over the **Defendant Funds** because

pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida.

28 U.S.C. § 1355(b)(1)(A).

7.      Because the **Defendant Funds** are in the government's possession,

custody, and control, the United States requests that this Court issue an arrest

warrant *in rem*, upon the filing of the complaint, pursuant to Supplemental Rule

G(3)(b)(i). Rule G(3)(b)(i) requires the Clerk to issue a warrant of arrest *in rem* for

2

defendant property if such property is in the government's possession, custody, or control.

8.      After the Court issues the warrant of arrest *in rem*, the United States will execute the warrant pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## STATUTORY BASIS FOR FORFEITURE

9.      The **Defendant Funds** represent proceeds of violations of 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud) and are, therefore, subject to civil forfeiture by the United States, pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses. 18 U.S.C. § 981(a)(1)(C). Section 1956(c)(7)(A) incorporates the racketeering offenses under 18 U.S.C. § 1961. Wire fraud offenses in violation of 18 U.S.C. § 1343 are specified unlawful activities under 18 U.S.C. § 1961(1). *See* 28 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 1956(c)(7)(A), and 18 U.S.C. § 1961(1).

10.      Additionally, the **Defendant Funds** constitute property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956, or are traceable to such property and are, therefore, subject to civil forfeiture by the United States pursuant to 18 U.S.C. § 981(a)(1)(A). Section 981(a)(1)(A) provides for the civil forfeiture of any property, real or personal, involved in a transaction or

attempted transaction in violation of section 1956, or any property traceable to such property.

## FACTS

11.     Specific facts supporting the forfeiture of the **Defendant Funds** have been provided by Keith Harris, Special Agent of the United States Secret Service (USSS), who states as follows.

12.     SA Harris' investigation began when S.F. ("Victim 1"), a Daytona Beach Shores, Florida[1] resident, reported to law enforcement that he was the victim of a cryptocurrency investment fraud scam, in which he suffered a loss of approximately $317,000.00.[2] Specifically, between April 18, 2024, and June 17, 2024, these funds were wired in interstate commerce from Victim 1's bank account in Daytona Beach Shores, Florida, through multiple intermediary addresses located on the Ethereum and Bitcoin blockchains, before a portion of the funds (83,745 USDT) were ultimately transferred to the **Subject Address**, from which the **Defendant Funds** were seized.

13.     During the course of the investigation, SA Harris also learned that approximately 789,857 USDT belonging to a total of 15 other victims of similar scams, was also transferred to the **Subject Address** after traversing through multiple intermediary accounts on the Ethereum blockchain. As explained further below, his

---

[1] Daytona Beach Shores, Florida is located within the Middle District of Florida.
[2] Although Victim 1 reported an estimated loss amount of $700,000, transaction records received from Crypto.com, revealed a verified a loss amount of at least approximately $317,000.

analysis of the relevant transactions revealed activity consistent with money laundering.

14.     This investigation has further revealed that the **Defendant Funds** were received in the **Subject Address** in two separate transactions from two different consolidation addresses that were used to launder the proceeds of multiple cryptocurrency investment fraud scams: **Money Laundering Address A**[3] and **Money Laundering Address B.**[4]  These addresses were used to combine USDT from victims of cryptocurrency investment fraud scams all over the world.  Once combined, the funds were moved to the **Subject Address**.

## Background Related to Virtual Currency

15.     Virtual currency, or digital currency, is currency that exists only in digital form. Cryptocurrencies are a type of virtual currency that can act as a decentralized, peer-to-peer, network-based medium of value or exchange. Cryptocurrencies may be used as a substitute for fiat currency[5] to buy goods or services or may be exchanged for fiat currency or other cryptocurrencies. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Cryptocurrency can be exchanged directly from person to person, through a cryptocurrency exchange, or through other intermediaries. A

---

[3] **Money Laundering Address A** is 0xac7259f9c490d69cfb85ed1e63ebf0e195ef3ffa.
[4] **Money Laundering Address B** is 0xeeaadbf7d884631eb131fb054e584aaa6545e8d9.
[5] Fiat currency is a type of currency that is issued by the government and not backed by physical commodities, such as gold. The U.S. dollar, the euro, and the pound are examples of fiat currencies.

cryptocurrency exchange or Virtual Asset Service Provider, hereafter referred to as a VASP, is a business that allows customers to trade cryptocurrencies for other cryptocurrencies or other forms of value, such as traditional fiat currencies. VASPs doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information about their customers and verify their clients' identities.

16.     Generally, cryptocurrency is not issued by any government, bank or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction. Investigators can trace the flow of cryptocurrency funds, in part, by analyzing these publicly available blockchain entries.

17.     Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. One wallet can contain multiple cryptocurrency addresses, each of which can be used to transfer or receive cryptocurrency.

18.     To conduct transactions on a blockchain, an individual must use the public address, (or "public key") and the private address (or "private key"). A public key is akin to a bank account number, and a private key is akin to a Personal

6

Identification Number (PIN) or password that allows a user the ability to access and transfer value associated with the public key. Each public key is controlled and/or accessed by the unique corresponding private key needed to access the address. Only the holder of an address's private key can authorize any transfer of cryptocurrency from that address. To complete a transaction, a sender needs only the public address of the receiving party and the sender's own private key. Once the sender's transaction announcement is verified by the network, the transaction is added to the blockchain.

19.     Because the sending and receiving addresses are represented on the blockchain by alphanumeric strings rather than personal details, the blockchain on its own rarely reflects any identifying information about either the sender or the recipient. However, investigators can use the blockchain to trace funds to, among other recipients, VASPs. Because VASPs, generally collect identifying information about their customers, as discussed above, subpoenas or other appropriate legal process submitted to exchangers can, in some instances, reveal the identity of an individual responsible for a transaction.

20.     Cryptocurrencies have many known legitimate uses. However, much like cash, cryptocurrencies can be used to facilitate illicit transactions and to launder criminal proceeds, particularly given the ease with which these assets can be moved with high levels of anonymity.

21.     Bitcoin (BTC) is a type of cryptocurrency, circulated over the Internet. Bitcoins are not issued by any government, bank, or company, but rather are

controlled through a computer software operating via a decentralized, peer-to-peer network. Bitcoin transactions are recorded on the bitcoin blockchain.

22.    Ethereum[6] (ETH) is a cryptocurrency that is open source, public, has its own blockchain and is distributed on a platform that uses smart contract technology.[7] The public ledger is the digital trail of the Ethereum blockchain which allows anyone to track the movement of ETH.

23.    Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the referenced asset or its derivatives.

24.    Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens. USDT is hosted on the Ethereum and Tron blockchains, among others.

25.    It is common practice amongst individuals who transact in cryptocurrency to send a small amount of funds to the next receiving address before sending a larger amount, to test that the receiving address is the intended destination/recipient. This is what is commonly referred to as a "test transaction."

---

[6] Https://ehtereum.org.
[7] Smart contracts are computer protocols that automatically enforce a pre-arranged negotiation between individuals conducting a transaction. These protocols are also sometimes called self-executing contracts.

26.     It is common practice for perpetrators of cryptocurrency investment fraud scams to encourage victims to use, what is commonly referred to as, a trust wallet. A trust wallet is a non-custodial cryptocurrency wallet, which allows the user to have full control over the funds in the wallet. The perpetrators of cryptocurrency investment fraud scams encourage the victims to use a trust wallet as the first deposit location for victim funds to prevent the VASPs from identifying a common address as being associated with a reported scam. The use of trust wallet also builds a false trust with the victims by telling the victims that they are always in control of the cryptocurrency.

27.     WhatsApp is an internationally available electronic messaging service owned by Meta Platforms Inc. (formerly Facebook), which allows users to communicate via instant message or voice-over-IP call. In addition to basic messaging, WhatsApp users can create groups, send each other unlimited images, video and audio media messages, and make voice calls. As opposed to traditional phone communications, WhatsApp users are not bound by geography; a WhatsApp user can communicate with any other user anywhere in the world simply through use of the WhatsApp application. For this reason, WhatsApp is a popular tool for those seeking to communicate internationally. Additionally, WhatsApp features end-to-end encryption, a method of secure communication that prevents third parties from accessing data while it is transferred from one end system or device to another. Because only the intended recipient can decrypt the sent data, WhatsApp is broadly

considered a more private, more secure alternative to standard SMS or MMS communications.

28. Because communications are encrypted, perpetrators commonly use WhatsApp to communicate with victims. WhatsApp's encryption features allow perpetrators to conceal their communications from unwanted recipients, including law enforcement, and its international reach allows perpetrators to connect easily with victims across the globe. Notably, a WhatsApp user can use a phone number with a country code separate from the country where he or she is physically present; this can allow, for example, a perpetrator in China to claim he is located in Orlando, Florida and to bolster the credibility of that claim by using a phone number with an American country code (+1) and an Orlando, Florida area code (321).

29. Because most of the transactions conducted in cryptocurrency are located on a public blockchain, it is possible for the public, to include law enforcement, to identify the owner of a particular Bitcoin address by analyzing the blockchain. This analysis can also reveal additional addresses controlled by the same individual or entity. For example, a business owner may create multiple Bitcoin addresses to receive payments from different customers. Then, when the business owner wants to use the bitcoin that he or she has received (e.g., to exchange bitcoin for other currency or to purchase goods or services), the business owner may group those Bitcoin addresses together into a single transaction. This grouping allows law

enforcement to conclude that the same group, person, or entity controls all the addresses that are used on the input side of the transactions.

30.    While investigating suspicious virtual currency transactions, law enforcement officers frequently use commercial services offered by several different blockchain-analysis companies. These private companies analyze the blockchain and attempt to identify the individuals or groups involved in the virtual currency transactions. Specifically, these private companies create large databases that group transactions into "clusters" based on patterns and a variety of heuristics. "Open-source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020). Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

31.    Because the blockchain is public, law enforcement can also conduct tracing of funds in reverse to determine the origin of the cryptocurrency funds that are held in balance on blockchain addresses.  This allows law enforcement to identify the source of funds that are transacted, some of which originate from previously un-reported victims of scams and frauds.

## The Investigation

### A.    Victim 1 Report

32.    On or about September 4, 2024, after receiving the initial report from Victim 1, the USSS interviewed Victim 1.  According to Victim 1, in January 2024,

11

Victim 1 received a text message from an unknown person asking Victim 1 to take care of the sender's dog while they were out of town.  Victim 1 texted the person back stating that he/she had the wrong number. The sender of the text message introduced herself as "Astrid Orlov." She told Victim 1 she was from Lake Nona and that she lived with her uncle. Not long after the initial contact via text message, "Orlov" transitioned the conversation to WhatsApp. On approximately two occasions, Victim 1 and "Orlov" attempted to video chat. However, during the video chats, Victim 1 was unable to see "Orlov", but "Orlov" insisted that was due to Victim 1's weak internet connection. During their conversations, "Orlov" repeatedly told Victim 1 that "Orlov" was successfully trading gold online. "Orlov" told Victim 1 that she had so much success because her uncle would watch algorithms to determine what was going to happen daily with the price of gold.

33.    During one of these conversations, "Orlov" convinced Victim 1 to invest into the trading platform, "XM Defi." At the direction of "Orlov," Victim 1 opened a Crypto.com account under Victim 1's name. This account was controlled by Victim 1. On February 23, 2024, at the direction of the "Orlov," Victim 1 conducted a wire transfer of $5,000, from his bank account to his Crypto.com account.  After receiving the wire into his Crypto.com account, Victim 1 used the funds to buy approximately 0.0902489 BTC. On February 27, 2024, at "Orlov's" direction, Victim 1 sent the 0.0902489 BTC to an address provided by "Orlov."[8]

---

[8] **Transaction hash ID**: 997f8ee99aac7b8194889cc6a20c22d6a2147c225c5a961af8bc4ffab52a81d1.

Afterward, when Victim 1 signed into the XM Defi account that "Orlov" instructed him to create, his account reflected the recent deposit of BTC. "Orlov" instructed Victim 1 as to when he should buy and sell assets through the website to make a profit. Following his initial investment, Victim 1 was able to view what he later learned to be fictitious "earnings" on the website. Victim 1 was curious if he could withdraw his funds from the website. On March 1, 2024, Victim 1 successfully withdrew about 0.00449 BTC (approximately $278) from his XM Defi account to his account at Crypto.com.  After his first successful withdrawal of what he believed to be profits from the website, Victim 1 believed that with "Orlov's" assistance, he could successfully trade gold and make a large amount of money on the platform.

34.    Between February 28, 2024, and March 21, 2024, Victim 1 conducted another three BTC transactions, through which he sent BTC valued at approximately $120,500 from his Crypto.com account to the Bitcoin address that "Orlov" provided.[9] In late March and again in May, "Orlov" provided Victim 1 with two different cryptocurrency addresses – this time on the Ethereum blockchain – and directed Victim 1 to send funds to the new addresses. Between March 22, 2024, and May 19, 2024, Victim 1 conducted three USDT transactions, across which he sent USDT valued at approximately $191,435 from his Crypto.com account to the new Ethereum addresses. During this time, Victim 1 conducted "trades" on and through

---

[9] **Transaction hash IDs**: 086913a20a394c1bea28cf6da2f5d05ebc97c49b37c672a867a62b8ae55ceaf8; a423136701ac7bb7b77eb7720939427d4997a19877151340a39a8638f5c5870e; 6237ca0a89ad140001694e9a50025a82035d667b158e6327ba062b042e64d996.

the "XM Defi" fraudulent website. Nearly each time he conducted a trade, his investment on the website appeared to grow. Victim 1 stated that during this time, it appeared he only lost a small amount of money on two "trades."

35.     In late April 2024, "XM Defi" began deducting funds from Victim 1's account balance on the platform. It was at this time that Victim 1 expressed concerns to "Orlov." In response, "Orlov" sent a partial picture of a Florida driver's license to attempt to prove her legitimacy:[10]



36.     At some point between late April and May 20, 2024, Victim 1 decided to attempt to withdraw his money from the account to prevent the platform from the continued deductions. After several failed attempts to withdraw funds from his account, Victim 1 realized that "XM Defi" was a scam.

---

[10] A search of the Florida Driver and Vehicle Information Database revealed that no Florida Driver's License had been issued to this name.

## B.    Identification of Other Victims

37.    The source of funds deposited into the **Subject Address** originated from, or passed through, addresses that have been attributed by commercial tracing tools with approximately 14 unique cryptocurrency investment fraud scams.[11] As of February 2025, a query of the Federal Bureau of Investigation's Internet Crime Complaint Center (IC3) and the Federal Trade Commission's (FTC) Consumer Sentinel Network, revealed 271 reports of individuals who were victimized by one of those 14 cryptocurrency investment fraud scams, with a total loss of approximately $62 million.

## C.    Movement of USDT from Victim Deposits to the Subject Address

38.    To date, USSS has identified at least 15 additional individuals (other than Victim 1) who reported being victimized by a similar scheme, and whose funds, or a portion thereof, make up the **Defendant Funds**. Transaction records related to the additional 15 victims showed a cumulative loss of approximately $4,050,700.

39.    All the additional victims listed provided a similar explanation of their involvement in a cryptocurrency investment fraud scheme. After initially contacting the victims purportedly by accident, via text message, an innocuous friend request

---

[11] Those related and attributed scams, along with their approximate reported losses, are: xmdefi.net ($4.2 million), cofglobol.com ($5.1 million), shiliblock.com ($502,000), blockcoin01.com ($213,000), fidefx.com ($3.5 million), dgctcfx.com ($6.6 million), world-exs.com ($435,000), fbxlized.com aka fbxdot.cc aka coinmesg.com ($240,000), bitcoinsoptions.com ($3.6 million), sundell-fx.com ($18 million), doextras.com aka Doexali.com ($13.9 million), nft-uniswap.net ($3.2 million), aircarbon.cc ($584,000), and gssglobalfex.com aka gssgloballimited.com ($1.4 million).

through social media, or in one instance, a phone call, the scammers spent time trying to get to know the victim. The scammers sent pictures of attractive men and women to the victims representing themselves as the people in the pictures. The scammers also sent pictures of food, scenery, and pets to establish a rapport with the victims. After a few weeks of conversation, the scammers began talking about ways they make large amounts of money investing in cryptocurrency. Through these conversations, the scammers convinced the victims to invest money into cryptocurrency with the promise of a profit.

40.    Following the victims' initial investments, and to create a sense of legitimacy within the victims' minds, the victims were prompted to log into a fraudulent investment webpage controlled and created by the scammers and co-conspirators. They saw a webpage that reflected the money that they deposited and believed they had invested, posing as a legitimate cryptocurrency trading platform. Victims believed they could withdraw their principal and proceeds of their investment later. A portion of each victims' money was directly traced to the **Defendant Funds**. Chart 1, below, is a summary of information gathered from the interviews of, and transaction records relating to, the 16 identified victims.

16

**Chart 1.**

| Victim Number - Initials | Exchange | Scam Start | Scam Name | Total Approximate Loss (USD) | Traced to Defendant Funds (USDT) |
|---|---|---|---|---|---|
| **1 - S.F.** | Crypto.com | Jan-24 | XM Defi | $ 317,000.00 | 83,745 |
| **2 - G.L.** | Kraken.com | Feb-24 | XM Defi | $ 195,000.00 | 193,245 |
| **3 - D.S.** | Crypto.com | Mar-24 | cofglobalfx.com | $ 152,000.00 | 89,539 |
| **4 - D.H.** | Crypto.com | Apr-24 | XM Defi | $ 131,000.00 | 68,228 |
| **5 - J.A.** | Crypto.com | Aug-23 | dbrsleader.cc | $ 605,000.00 | 44,542 |
| **6 - J.S.W.** | Crypto.com | Jun-23 | XM Defi | $ 654,000.00 | 34,763 |
| **7 - T.W.** | Kraken.com | Apr-24 | cofglobol.com | $ 50,000.00 | 49,000 |
| **8 - J.M.** | Coinbase | Feb-24 | gssglobalfex.com | $ 611,000.00 | 60,364 |
| **9 - R.Z.** | Kraken.com | Mar-24 | terne.cc, tnfl.cc | $ 69,700.00 | 40,000 |
| **10 - Y.Y.** | Coinbase | Jan-24 | xtb-online.vip | $ 883,000.00 | 50,000 |
| **11 - H.Z.** | Kraken.com | May-24 | Worldproex.com | $ 93,000.00 | 34,393 |
| **12 - T.B.** | Crypto.com | May-24 | cofglobal.com | $ 20,000.00 | 19,512 |
| **13 - T.J.** | Kraken.com | Mar-24 | cofglobal.com | $ 46,000.00 | 12,625 |
| **14 - D.W.** | Crypto.com | Jan-24 | XM Defi | $ 205,000.00 | 23,820 |
| **15 - K.P.** | Crypto.com | Mar-24 | XM Defi | $ 45,000.00 | 19,519 |
| **16 - S.U.** | Crypto.com | Jan-24 | XM Defi | $ 291,000.00 | 50,307 |
| | | | **Total** | **$ 4,367,700.00** | **873,602** |

41.     The operators of the cryptocurrency investment fraud scams often used websites that have initials or wording that could be interpreted as being related to another entity that is regulated or known to the victim. For example, six of the victims were told they were investing using the "XM Defi" platform or some variation of the XM[12] name. Four of the victims reported being scammed by the website cofglobol.com.  Those victims were told, and believed, that "cof" in "cofglobal.com" stood for "Capital One Finance."[13] Victim 8 was directed to use gssglobalfex.com to conduct these purported investments. Victim 8 was told by the scammer that this website was related to "Goldman Sachs Securities."[14]

42.     As discussed above, it was determined that 16 victims sent funds to numerous addresses, believing they were investing in various cryptocurrency trading platforms. Those funds then traversed through one of two common intermediary money laundering addresses in which victim funds were commingled with funds of known and unknown sources, before being ultimately transferred to the **Subject Address**, making up the **Defendant Funds**. The below illustration, Chart 2, shows the movement of all 16 victims' funds from the victim address to the **Subject Address**.

---

[12] A google search of XM found a website describing XM as an asset trading platform with a business registration in Cyprus doing business under a business name of Trading Point Holdings Ltd.
[13] Capital One Financial Corporation is a regulated and familiar financial institution located in the United States.
[14] Goldman Sachs is a multinational investment bank and financial services company.

**Chart 2.**[15]



[15] "Intermediary addresses" on Chart 2 represents movement of funds across more than one intermediary address which have been visually consolidated for clarity. "Money Laundering Address A" and "Money Laundering Address B" each represent one address.

43. The individual tracing of all 16 victims' funds is further explained and depicted below. All charts below illustrate the use of multiple or layered transactions to move the illegal proceeds to the **Subject Address**.

> ### *i.    Trace of Proceeds from Victim 1 to Subject Address*

44. As described above, Victim 1 made seven deposits totaling approximately $317,000 into the "XM Defi" scam. The funds from one of those deposits is traceable to the **Subject Address**. The below illustration (Chart 3.1) shows the movement of USDT from Victim 1 to the **Subject Address**.

**Chart 3.1.**



45.    On April 18, 2024, Victim 1 sent a wire for $86,000 from his Bank of America account through Community Federal Savings[16] to Crypto.com. Victim 1 then exchanged $86,000 for 83,745.07 USDT, after fees.  On that same day, Victim 1 sent those funds to his own un-hosted Ethereum address.[17] On that same day, he sent the full amount of USDT to Ethereum address **0xbd2011e89e69657c9d4327059faad76c8650051c**[18] ("**0xbd2011**"), which was an address provided by "Orlov."  Prior to Victim 1's deposit, **0xbd2011** was empty and had not conducted any transactions. No withdrawals from, or deposits to the address occurred until June 17, 2024, when **0xbd2011** transferred 83,745 USDT to **Money Laundering Address B** (where it was comingled with funds traceable to Victims 2 through 5, Victim 7, Victims 9 through 15, and with funds of unknown origin), leaving **0xbd2011** virtually empty.[19]

46.    Prior to the deposit of Victim 1's 83,745 USDT into **Money Laundering Address B**, **Money Laundering Address B** held a balance of 1,237,196 USDT, which consisted of funds partially traceable to Victims 3, 5, 7, and 9 through 15. Within less than one minute, **Money Laundering Address B** received two additional deposits traceable to Victims 2 and 4, totaling 261,472 USDT. Then on June 21, 22, and 26, 2024, **Money Laundering Address B** received an additional five

---

[16] Community Federal Savings is the corresponding bank that processes wires for Crypto.com
[17] **Transaction hash ID:** 0x6084d56bf39f7f2fd346eabe36d6897044e2b6e8675f28c6a08cfdedae39644c.
[18] **Transaction hash ID:** 0x8c44590d0628f541cdae269559fb6432c7c789b795b144a024a7544215d51206.
[19] **Transaction hash ID:** 0x6349a2242e5760b8d4a76762709b68ddac606a2b2adca61b746e342839ef2d60.

deposits from unknown sources, totaling 555,690 USDT, making the balance in **Money Laundering Address B** on June 28, 2024, 2,138,104 USDT.

47.    No funds were withdrawn from **Money Laundering Address B** until June 28, 2024, when **Money Laundering Address B** transferred 1,744,392 USDT (traceable to Victims 1, 2, 3, 4, 5, 7, and 9 through 15) to the **Subject Address**, leaving 393,712 USDT in **Money Laundering Address B**.[20]

### ii.    Trace of Proceeds from Victim 2 to Subject Address

48.    The below illustration (Chart 3.2) shows the movement of USDT from Victim 2 to the **Subject Address**. Victim 2 reported meeting an individual named "Jenny Young" via social media, who eventually convinced him to invest in cryptocurrency through the buying and selling of gold using "XM Pro Financial Ltd." Victim 2 reported, and Kraken records confirm, that Victim 2 lost approximately $195,000 to the "XM Pro Financial Ltd." scam.

---

[20] **Transaction hash ID:** 0x46889e4647d9259a250e1cb68c336cb1147e8df5461536db6a992577c234b472.

**Chart 3.2.**



49.     Between March 14, 2024, and May 18, 2024, Victim 2 conducted five

transactions transferring 193,245 USDT from his Kraken account to

**0x59e7ab85631532f0502a679ef248960ae0b08286** ("**0x59e7**").[21] Prior to this deposit,

**0x59e7** was empty, and received no other USDT deposits. No withdrawals occurred

from this address until June 17, 2024, when **0x59e7** transferred 193,245 USDT to

**Money Laundering Address B**, leaving **0x59e7** virtually empty. [22]

---

[21] **Dates of transactions**: March 14, 2024; April 5, 2024; May 9, 2024; May 9, 2024; May 18, 2024.
**Amounts of transactions**: 4,959 USDT; 19,806 USDT; 19,823 USDT; 99,127 USDT; 49,528 USDT.
**Transaction hash IDs**: 0xf61c34f177b1613eb753bb76455034362664188f41dc0e8830542c92ce19767f;
0xd3956ab8f7efa3a5122b00a3edd0df4efb1ab834ffd116111b00f3f69b4a56c0;
0x824b83402ee45e58ea562e5c1f5d68d96278acabe8eefd0489148f002d793012;
0xd90bf46dce3e1e90797a7458359c5a5a6d4c6433e4acf97ff2ecf4b174cea445;
0xe130ee4b63d4908e663b0bab0ebc71e202c45bde1d760530ac07bcc1b22cb9ce.

[22] **Transaction hash ID:** 0x7f2eef012015b799c1231a3116a3f478e7bc8dd8c6b953eefcd262f62598fbc5.

50.     Prior to the deposit of Victim 2's 193,245 USDT into **Money Laundering Address B**, **Money Laundering Address B** held a balance of 1,320,941 USDT, which consisted of funds partially traceable to Victims 1, 3, 5, 7, and 9 through 15, and with funds of unknown origin. Within less than a minute of receiving the funds traceable to Victim 2, **Money Laundering Address B** received a deposit traceable to Victim 4, totaling 68,227 USDT.[23] Then on June 21, 22, and 26, 2024, **Money Laundering Address B** received an additional five deposits from unknown sources, totaling 555,690 USDT, making the balance in **Money Laundering Address B** on June 28, 2024, 2,138,103 USDT.

51.     The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 1. *See supra* para. 47.

> ### iii.     *Trace of Proceeds from Victim 3 to Subject Address*

52.     The below illustration (Chart 3.3) shows the movement of USDT from Victim 3 to the **Subject Address**. Victim 3 reported meeting an individual named "Raphaela" after receiving a purported accidental text message from an unknown number. "Raphaela" eventually convinced him to invest in cryptocurrency through the buying and selling of gold using "cofglobal.com."

---

[23] **Transaction hash ID:** 0x5d7255ef93ed9b90b96032bfb33906571163928fa9c5ad578a45354df908e0a9.

**Chart 3.3**



53.     On May 11, 2024, and May 24, 2024, Victim 3 made two deposits

(totaling approximately 97,340 USDT) from his Crypto.com account to

**0xeba4735b9c946519cd300fbd7101e5a82f4434f0** ("**0xeba47**").[24] Prior to the first

deposit, **0xeba47** was virtually empty. On May 11, 2024, about 59 minutes after

Victim 3's first deposit, the same amount was transferred from **0xeba47** to

**0xf18ec0fe8192541f58798d6444a7be38501add2** ("**Consolidation Address A**"),

leaving **0xeba47** virtually empty once again.[25] On May 25, 2024, approximately two

hours after Victim 3's second deposit, the same amount was transferred from

**0xeba47** to **0x874cecf3b73b2425bc17251dfb196f27341ef25e** ("**0x874cec**"), leaving

**0xeba47** virtually empty once again.[26]

---

[24] **Dates of transactions:** May 11, 2024; May 24, 2024.
**Amounts of Transactions:** 48,726, USDT; 48,614 USDT.
**Transaction hash IDs:** 0xa20aceba740a3003eee8564dfc338ab59b48fd462919b308ad431aba3e24d6ba;
0x65009fc8f4e054ce840ebd700a2c2ce1133b1d68858b3fe60bc2a12ceb5ac42b.
[25] **Transaction hash ID:** 0x075e422342d7b58cd2ad974428dd90f117e8c478ab70cb41453fb4307019f423.
[26] **Transaction hash ID:** 0x0e03ffc833a7dd1d274d9ec1eb3f063c2a678b84ea55776f1d58e99997e4cf49.

54.    Prior to the deposit of Victim 3's funds into **Consolidation Address A** on May 11, 2024, **Consolidation Address A** held a balance of 10,023 USDT, which consisted of funds of unknown origin. Following the deposit of Victim 3's 48,726 USDT, between May 11, 2024, and June 4, 2024, **Consolidation Address A** received eight other USDT deposits totaling 89,443 USDT, a portion of which was traceable to Victims 7 and 12, making the balance in **Consolidation Address A** 148,193 USDT.  No USDT was withdrawn from the address until June 4, 2024, at 2:05 pm, when **Consolidation Address A** transferred 148,193 USDT to **0x13cfc80abed660c8c7b4d41e1df283f9aa69fc9c** ("**Consolidation Address B**"), leaving **Consolidation Address A** virtually empty.[27]

55.    On May 25, 2024, prior to the deposit of Victim 3's funds into **0x874cec**, the address was empty. Following the deposit of Victim 3's 48,614 USDT, on May 25, 2024, and May 26, 2024, **0x874cec** received two deposits from unknown sources totaling 3,353 USDT, resulting in a balance of 51,967 USDT. Then on May 31, 2024, **0x874cec** transferred 7,801 USDT to an unrelated address on the Ethereum blockchain, leaving 44,166 USDT in **0x874cec**. On June 2 and 3, 2024, **0x874cec** received an additional two deposits from unknown sources totaling 5,411 USDT, resulting in a balance of 49,579 USDT. No additional USDT was withdrawn until June 4, 2024, at 2:07 pm, when **0x874cec** transferred 49,579 USDT to **Consolidation Address B**, leaving **0x874cec** empty.[28] This transfer occurred two minutes following

---

[27] **Transaction hash ID:** 0x6ac6602d501338fceeb269641a8a1c9b277ae677091c6693cbc93f9e26be021c.
[28] **Transaction hash ID:** 0x39154d21b97b938b43fd05c33d44d9890d284f56dee8508464e7f8f968ae1873.

the transfer of Victim 3's funds from **Consolidation Address A** to **Consolidation Address B**, described above.

56.     On June 4, 2024, prior to receiving the two deposits traceable to Victim 3 from **Consolidation Address A** and **0x874cec**, **Consolidation Address B** held a balance of 74,561 USDT, consisting of funds traceable to Victim 5 and funds of unknown origin. Between June 4, 2024, and June 5, 2024, following the two deposits traceable to Victim 3 (of 148,193 USDT and 49,579 USDT), **Consolidation Address B** received six deposits, totaling 41,558 USDT, resulting in a balance of 313,892 USDT.  Then, on June 5, 2024, **Consolidation Address B** transferred 25 USDT to **Money Laundering Address B**, likely as a test transaction.[29] Four minutes later, **Consolidation Address B** transferred 309,975 USDT to **Money Laundering Address B**,[30] leaving **Consolidation Address B** with a balance of 3,891 USDT.

57.     Prior to the deposit of 309,975 USDT, **Money Laundering Address B** contained 34,970 USDT, consisting of the prior test transaction and funds of unknown origin, some of which were attributed by a blockchain analysis company to funds related to the "cofglobol.com" scam. Following the receipt of 309,975 from **Consolidation Address B**, between June 5, 2024, and June 6, 2024, **Money Laundering Address B** received seven deposits, totaling 725,405 USDT, consisting of funds traceable to Victim 11 and funds of unknown origin. On June 7, 2024, **Money Laundering Address B** transferred 6,199 USDT to an unrelated address on

---

[29] **Transaction hash ID:** 0x65eafd5b852d9bc42ab4186422ccb27d66ea70a2dba404a8e07b1a979adaad4f.
[30] **Transaction hash ID:** 0xef7ec7fb9b394a810fc1380531c1c33057e6406cf0ab037443d159d2dda0ebc8.

the Ethereum blockchain, resulting in a balance of 1,064,151 USDT. Between June 8, 2024, and June 26, 2024, **Money Laundering Address B** received an additional 11 deposits, totaling 1,073,953 USDT, consisting of funds traceable to Victims 1, 2, 4, 9, 10, 14, and 15, and funds of unknown origin, resulting in a balance of 2,138,104 USDT.

58.     The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 1. *See supra* para. 47.

### iv.    Trace of Proceeds from Victim 4 to Subject Address

59.     The below illustration (Chart 3.4) shows the movement of USDT from Victim 4 to the **Subject Address**. Victim 4 reported meeting an individual after receiving a purported accidental text message from an unknown number. After further conversation with the unidentified individual, the individual eventually convinced him to invest in cryptocurrency through the buying and selling of gold using "XM Pro Financial." Two of Victim 4's deposits to the XM Pro Financial Scam are traceable to the **Subject Address**.

**Chart 3.4.**



60.     On May 9, 2024, Victim 4 transferred 48,738 USDT from his

Crypto.com account to **0x22a434722faeccc7295568595b8432542a709c2d**,

("**0x22a4**").[31] Then on May 30, 2024, Victim 4 transferred 19,490 USDT from his

Crypto.com account to **0x88bf33823bc47e7d8f7e8b8a8cd638f012b6be45**,

("**0x88bf**").[32]

61.     On May 9, 2024, prior to the initial deposit from Victim 4, **0x22a4** was

empty. Following the deposit of Victim 4's 48,738 USDT, no transactions occurred

in **0x22a4** until May 30, 2024, when **0x22a4** received an additional deposit of 19,490

USDT, directly traceable to Victim 4, resulting in a balance of 68,228, consisting

only of funds traceable to Victim 4.

62.     On May 30, 2024, prior to the deposit of Victim 4's 19,490 USDT,

**0x88bf** was empty. Approximately two hours after receiving Victim 4's 19,490

---

[31] **Transaction hash ID:** 0x68ae07df6bf30115594c82128ccf86107961a0f04476fc221779f8504c907f3f.

[32] **Transaction hash ID:** 0x8fc93d49e2a91c5bfbb9700ab2eb8db9d399f57fc5712ff46ddc47d580eaba7d.

USDT, **0x88bf** transferred the entire amount to **0x22a4**, where it was comingled with funds traceable entirely to Victim 4, as discussed directly above.[33] No additional transactions occurred in **0x22a4**, until June 17, 2024, when **0x22a4** transferred the entire balance (68,228 USDT) to **Money Laundering Address B**.[34]

63.     On June 17, 2024, prior to the 68,228 USDT deposit, **Money Laundering Address B** contained 1,514,186 USDT, consisting of funds traceable to Victims 1 through 3, 5, 7, 9 through 15, and funds of unknown origin. Following the receipt of the 68,228 USDT, between June 21, 2024, and June 26, 2024, **Money Laundering Address B** received an additional five deposits, consisting of funds of unknown origin, totaling 555,690 USDT, resulting in a balance of 2,138,104 USDT.

64.     The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 1. *See supra* para. 47.

### v.    *Trace of Proceeds from Victim 5 to Subject Address*

65.     The below illustration (Chart 3.5) shows the movement of USDT from Victim 5 to the **Subject Address**. Victim 5 reported that in August 2023, he received a friend request on LinkedIn, from an individual named "Ye Wangqui." "Ye" struck up conversation with Victim 5 and told Victim 5 that she went by "Emily." "Emily" claimed to have experience with cryptocurrency trading, using the website "dbrsleader.cc." Eventually, "Emily" convinced Victim 5 to invest in cryptocurrency trading using the same platform. Initially, Victim 5 was skeptical of the purported

---

[33] **Transaction hash ID:** 0xc210d9a0910fb46d9a481fdb652eab20bbb15530080444e9b29073922de758e4.
[34] **Transaction hash ID:** 0x5d7255ef93ed9b90b96032bfb33906571163928fa9c5ad578a45354df908e0a9.

returns, so he sent approximately $7,000 worth of cryptocurrency as an initial investment. Thereafter, as the fraudulent site displayed that he had made gains on his "investment" he successfully withdrew approximately $2,000. This successful withdrawal convinced Victim 5 that he could get his money back at any time, and that the trading platform was legitimate. As a result, Victim 5 continued to deposit cryptocurrency in increasingly larger amounts. Three of Victim 5's deposits to the "dbrsleader.cc" scam are traceable to the **Subject Address**.

**Chart 3.5.**



66.     On May 14, 2024, Victim 5 transferred 42,064 USDT from his Crypto.com account to **0x0bd942e7e576cdd03e25f70644ee287fdf06cdbe** ("**0x0bd942**"), which he had used several times prior to deposit funds into the

purported investment platform.[35] Then, on May 31, 2024, in two transactions, Victim 5 transferred a total of 19,989 USDT from his Crypto.com account to **0xf46e7eb6ea3c25a411ae7bde6de096a56795a51a**, ("**0xf46e7**").[36]

67.     On May 14, 2024, prior to receiving Victim 5's 42,064 USDT, **0x0bd942** was empty.  Then, on May 18, 2024, **0x0bd942** transferred 17,509 USDT to an unrelated address on the Ethereum blockchain, resulting in a balance of 24,555 USDT. No additional transaction occurred in **0x0bd942** until June 4, 2024, at 1:57 pm when **0x0bd942** transferred the entire remaining balance (24,555 traceable to Victim 5) to **Consolidation Address B**, where it was comingled with funds traceable to Victim 13 and funds of unknown origin.[37]

68.     On May 31, 2024, prior to the deposit of Victim 5's 19,989 USDT, **0xf46e7** was empty. No other USDT transactions occurred in **0xf46e7** until June 4, 2024, at 1:59 pm, when **0xf46e7** sent its entire balance (19,989 USDT) to **Consolidation Address B**.[38] This transfer occurred two minutes following the transfer of Victim 5's funds from **0x0bd942** to the same receiving account, described above.

69.     On June 4, 2024, prior to receiving both deposits traceable to Victim 5, **Consolidation Address B** contained 25,659 USDT, consisting of funds traceable to

---

[35] **Transaction hash ID:** 0x27de82edf975ce28b0e474c41fad3595325ebe661674063c7be35bdd7adcd0b6.
[36] **Amounts:** 18,858 USDT; 1,129 USDT.
**Transaction hash IDs:** 0xd2c661c70f5c7cc9bfc5ff4f365b342ef50e3ee631a1a89046ef03c032d6b90a; 0x241113d1951c636828e71ffb464728181a06644af5e42f87b5ecec56db91bfca.
[37] **Transaction hash ID:** 0xd6db1c57307460404f1dad47fdbdafbeca621330eb9d800890e9c605967b8207.
[38] **Transaction hash ID:** 0x1567e22748fc93d09cab210f29f94af9374011db3f42170cf28de51d3162174a.

Victim 13 and funds of unknown origin. Following the deposits from **0x0bd942** and **0xf46e7**, (totaling 44,544 USDT) **Consolidation Address B** received ten deposits totaling 243,688 USDT, which consisted of funds traceable to Victims 3, 7, and 12, and funds of unknown origin, resulting in a balance of 313,892 USDT.

70.     The remaining trace of relevant funds to the **Subject Address** is detailed above in the trace of funds belonging to Victim 3. *See supra* paras. 55-57.

### vi.    *Trace of Proceeds from Victim 6 to Subject Address*

71.     The below illustration (Chart 3.6) shows the movement of USDT from Victim 6 to the **Subject Address**. Victim 6 reported that in June 2023, he received a purported accidental phone call from an unknown individual, who identified herself as "Michelle Chen." Following the initial phone call, Victim 6 continued to chat with "Michelle" via text message, and then WhatsApp, upon "Michelle's" request. Eventually, "Michelle" convinced Victim 6 to invest in cryptocurrency trading, using the platform "aircarbon.cc." On or about January 2024, Victim 6 realized "aircarbon.cc" was a scam. Then, in or around March 2024, Victim 6 received a message via Telegram[39] from an individual named "Ginny." After additional conversation, Victim 6 explained to "Ginny" that he had been scammed by "aircarbon." "Ginny" appeared sympathetic to Victim 6's prior victimization, and offered to help Victim 6 recover his funds by trading with "XM Defi." Victim 6 reported "investing" approximately $700,000 using crypto.com. Crypto.com records

---

[39] Telegram is a free cloud-based messaging application designed for mobile electronic devices, that allows users to send text messages, voice messages, photos and videos.

confirmed he lost approximately $654,000 to these scams.[40] One of Victim 6's

transactions to "XM Defi" is traceable to the **Subject Address**.

**Chart 3.6.**



72.     On April 2, 2024, Victim 6 made one deposit (totaling approximately

49,689 USDT) from his Crypto.com account to an un-hosted address controlled by

Victim 6 that he previously used to transfer USDT to the "aircarbon" investment

scam.[41] One hour later, Victim 6 transferred 49,689 USDT from his unhosted

address to **0xd39e06028871c4756ff685dfd5a6d0d18e35a46b** ("**0xd39e06**").[42] Prior to

this deposit from Victim 6, **0xd39e06** was empty and had not conducted any

transactions.  On April 5, 2024, and April 9, 2024, **0xd39e06** received two additional

---

[40] Victim 6 also used Coinbase to deposit money into these scams. As of this date, Victim 6's total loss has not been determined.

[41] **Transaction hash ID:** 0xfabdd30c6afe358d7643a22fee3109cc76d331d0a5f794d06a76977961adc1ed

[42] **Transaction hash ID:** 0x9d3226214d6cd388d1982970fc4388a8eab8dc104f3a887a0d0c0cfd78ae7c8b

transactions from Victim 6, totaling approximately 97,400 USDT. On April 18,

2024, **0xd39e06** transferred a total of 98,000 USDT to an unrelated address on the

Ethereum blockchain, resulting in a balance of 49,089 in **0xd39e06**.  No additional

USDT transactions occur in **0xd39e06** until May 29, 2024, when **0xd39e06**

transferred the remaining 49,089 USDT to

**0xaabe4f5e5e35a849f6623af75d645f29ab6a6277** ("**0xaabe4f**").[43]

73.    Prior to the deposit of Victim 6's USDT into **0xaabe4f**, **0xaabe4f** was

empty and had not conducted any transactions. On May 30, 2024, **0xaabe4f**

transferred 14,095 USDT to an unrelated address on the Ethereum blockchain,

resulting in a balance of 34,994 USDT. One minute later, **0xaabe4f** transferred the

remaining 34,994 USDT to **Money Laundering Address A**.[44]

74.    On May 30, 2024, prior to the deposit of 34,994 USDT into **Money

Laundering Address A**, **Money Laundering Address A** held a balance of 1,111,589

USDT, consisting of funds of unknown origin. After receiving the 34,994 USDT on

May 30, 2024, between May 30, 2024, and June 28, 2024, **Money Laundering

Address A** received an additional 11 deposits totaling approximately 1,415,845

USDT, which consisted of funds traceable to Victims 8 (60,364 USDT) and 16

(49,984 USDT) and funds of unknown origin. During the same timeframe, **Money

Laundering Address A** conducted eight transfers of funds of unknown origin to one

unrelated address on the Ethereum blockchain, totaling approximately 196,820

---

[43] **Transaction hash ID:** 0xaae9f2329d79ba7412d3d6c115d87067b86533fd2106dfba7492a64905ee104b.
[44] **Transaction hash ID:** 0x931605185d804b1569c019175a01b945a8147619aacae92d7b72804c6ddd5d59.

USDT, and resulting in a balance of approximately 2,365,608 USDT in **Money Laundering Address A**.

75.    No funds were withdrawn from **Money Laundering Address A** until June 28, 2024, when **Money Laundering Address A** transferred the remaining 2,365,608 USDT (consisting of funds traceable to Victims 6, 8, and 16) to the **Subject Address**.[45]

### vii.    Trace of Proceeds from Victim 7 to Subject Address

76.    The below illustration (Chart 3.7) shows the movement of USDT from Victim 7 to the **Subject Address**. Victim 7 reported that in or around April 2024, Victim 7 received an "accidental" text message from an unknown number. The individual using the unknown number identified herself as "Mia Brown." Victim 7 and Mia continued conversation for several months, through text message and WhatsApp. Mia eventually convinced Victim 7 to invest in "spot gold"[46] trading using the platform "cofglobal.com." Victim 7 created an account at the scam site and proceeded to send funds to the scam through cryptocurrency exchanges such as crypto.com, Kraken, Swan Bitcoin, Bakkt, and via bank wire. Victim 7 reported losing approximately $80,000 in this scam. Records from Kraken revealed a

---

[45] **Transaction hash ID:** 0x9a1f6cac8df9f3bbf6ef49d3b97a2e1971d879a12e01b8f63b65b7c3d765d360
[46] Spot Gold Trading is the buying and selling of gold at current market prices without a delay in payments sent or received. Scammers usually falsely claim to know some secret way of trading that allows the "Gold traders" to make large profits.

verifiable loss of at least $59,129. One of Victim 7's deposits to cofglobal.com is traceable to the **Subject Address**.

**Chart 3.7.**



77.     On May 23, 2024, Victim 7 made one deposit (totaling approximately 49,574 USDT) from his Kraken account to **Consolidation Address A**. Prior to the deposit, **Consolidation Address A** contained 83,983 USDT, consisting of funds traceable to Victims 3 and 12, and funds of unknown origin. The following day, on May 24, 2024, **Consolidation Address A** received a deposit of 14,636 USDT traceable to Victim 12, resulting in a balance of 148,193 USDT. No other USDT transactions occurred in **Consolidation Address A** until June 4, 2024, when

**Consolidation Address A** transferred the remaining 148,193 USDT to

**Consolidation Address B**.[47]

78.     Prior to the deposit of 148,193 USDT, **Consolidation Address B**

contained 74,561 USDT, which consisted of funds traceable to Victims 5 and 13, and

funds of unknown origin. Following the deposit of 148,193 USDT, on June 4, 2024,

**Consolidation Address B** received an additional seven deposits totaling 91,137

USDT, consisting of funds traceable to Victim 3 and funds of unknown origin,

resulting in a balance of 313,892 USDT.

79.     The remaining trace of relevant funds to the **Subject Address** is detailed

above in the trace of funds belonging to Victim 3. *See supra* paras. 55-57.

> viii.     *Trace of Proceeds from Victim 8 to Subject Address*

80.     The below illustration (Chart 3.8) shows the movement of USDT from

Victim 8 to the **Subject Address**. Victim 8 reported that in or around February 2024,

Victim 8 received an "accidental" text message from an unknown number. The

individual using the unknown number identified herself as "Zhou Danhong," and

eventually moved the conversation with Victim 8 over to WhatsApp. As Victim 8

continued to talk with Zhou, their relationship became romantic, and Victim 8

believed Zhou was his girlfriend. In or around March 2024, Zhou convinced Victim

8 to open an account at gssglobalfex.com to invest his money. Victim 8 believed

gssglobalfex.com was related to Goldman Sachs Securities. Between March 2024

---

[47] **Transaction hash ID:** 0x6ac6602d501338fceeb269641a8a1c9b277ae677091c6693cbc93f9e26be021c

and September 2024, Victim 8 reported losing approximately $468,000 to this scam using his Coinbase account. Records from Coinbase revealed a verifiable loss of $561,000. One of Victim 8's deposits to gssglobalfex.com is traceable to the **Subject Address**.

**Chart 3.8**



81.    On May 23, 2024, Victim 8 made one deposit (totaling 60,364 USDT) from his Coinbase.com account to an un-hosted address also controlled by Victim 8.[48]  Less than 20 minutes later, Victim 8 transferred the same 60,364 USDT from his un-hosted wallet to address **0x9d2a31a7b72811883a038b4f8b497b65aede200b**, ("**0x9d2a31**").[49]

---

[48] **Transaction hash ID:** 0x7f6b935aa480b2f3c398f16f6d5ef238ab0712a2bebb7fbe2af676c3906087c5.
[49] **Transaction hash ID:** 0xec3a75729b1e7e046711f12542d8574e5061c6aabf55d1a36c35a551de864ddf.

39

82.     Prior to the Victim 8's deposit, address **0x9d2a31** contained 31,396 USDT, consisting of funds of unknown origin. Approximately one hour after receiving the 60,364 USDT from Victim 8, **0x9d2a31** received an additional deposit of 952 USDT from an unknown source, resulting in a balance of 92,712 USDT.  No additional transactions occurred in **0x9d2a31** until May 25, 2024, when **0x9d2a31** transferred 92,700 USDT to **0x5109c1a22e1945558aed587040cd8d8fa17fb701** ("**0x5109c1**"), leaving a balance of 12 USDT in **0x9d2a31**.[50]

83.     Prior to receiving the 92,700 USDT, **0x5109c1** contained 78,678 USDT, consisting of funds of unknown origin. Following the deposit of the 92,700 USDT, between May 25, 2024, and May 30, 2024, **0x5109c1** received four deposits from unknown sources, totaling 74,328 USDT, and across 9 transactions transferred 72,136 USDT to unrelated addresses on the Ethereum blockchain, resulting in a balance of 173,570 USDT.  No additional transactions occurred in **0x5109c1** until May 31, 2024, and June 1, 2024, when **0x5109c1** caused two transfers totaling 173,570 USDT from **0x5109c1** to **0xa871f8b8fd208ec97c3a4221f06aac75418ea444** ("**0xa871f8**"), leaving **0x5109c1** empty.

84.     Prior to receiving the deposit of the 173,570 USDT, **0xa871f8** contained 100,015 USDT of unknown origin, a portion of which was attributed by a blockchain analysis company to funds related to the same gssglobalfex.com scam. No additional

---

[50] **Transaction hash ID:** 0x6ac6602d501338fceeb269641a8a1c9b277ae677091c6693cbc93f9e26be021c.

transactions occurred in **0xa871f8** until June 2, 2024, when **0xa871f8** transferred its entire balance (273,585 USDT) to **Money Laundering Address A**.[51]

85.    Prior to the deposit of the 273,585 USDT, **Money Laundering Address A** contained 1,827,673 USDT, consisting of funds traceable to Victims 6 and 16, and funds of unknown origin. A portion these funds was attributed by a blockchain analysis company as related to the cofglobol.com, dbrsleader.cc, and gssglobalfex.cc. scams. Following the deposit of the 273,585 USDT into **Money Laundering Address A**, between June 2, 2024, and June 27, 2024, **Money Laundering Address A** received an additional six deposits of unknown origin, totaling 417,172 USDT, and conducted seven transfers to unrelated addresses on the Ethereum blockchain, totaling 152,822 USDT, resulting in a balance of 2,365,608 USDT in **Money Laundering Address A**. No additional transactions occurred until the June 28, 2024, transfer of 2,365,608 USDT from **Money Laundering Address A** to the **Subject Address**, as detailed above in the trace of funds belonging to Victim 6. *See supra* para. 75.

### ix.    *Trace of Proceeds from Victim 9 to Subject Address*

86.    The below illustration (Chart 3.9) shows the movement of ETH from Victim 9 to the **Subject Address**. Victim 9 reported that in or around March 2024, Victim 9 was contacted on Facebook by an individual named "Emily," who claimed she was interested in investing in Victim 9's small business. Eventually, Emily

---

[51] **Transaction hash ID:** 0xdfc460698cb77c28e2bdb31335750e66324c3c52695145f717c4d057b12201ab.

suggested they move their conversation to WhatsApp, and convinced Victim 9 to invest money in a trading platform with a high rate of return. Emily instructed Victim 9 to download an application called "Terne Global," which was associated with the web address "terne.cc." In June 2024, Victim 9 deposited funds from his bank account to his Kraken account, and then to the Terne Global app, where he saw what he believed to be gains on his investment. In or around late June, Victim 9 attempted to withdraw some of his purported earnings, but was told by the administrators of the website that he needed to pay taxes to effectuate the withdrawal. Records from Kraken reveal that Victim 9 lost approximately $69,700 to this scam using his Kraken account. Both of Victim 9's deposits to Terne Global is traceable to the **Subject Address**.

**Chart 3.9.**



87.     On June 4, 2024, and June 7, 2024, Victim 9 made two deposits (totaling approximately 18.02 ETH, valued at approximately $68,098 USD) from his Kraken account to address **0x762a751b6dbef61de72be8b919451969d511e63e** ("**0x762a**").[52] Within 11 and 24 minutes of receiving Victim 9's transactions, respectively, **0x762a** transferred the same amount of ETH to **0x1eaa9af245de73681f390f0f1da50cc3882ba482** ("**0x1eaa**").[53]

88.     Prior to the June 4, 2024, deposit of 11.84 ETH (approximately $44,548) **0x1eaa** contained 2.176 ETH of unknown origin. **0x1eaa** did not receive any additional deposits, until June 7, 2024, when the remaining ETH traceable to Victim 9 was transferred by **0x762a**, resulting in a balance of 20.196 ETH (approximately $76,936) in **0x1eaa**. The following day, on June 8, 2024, **0x1eaa** transferred 15 ETH (approximately $55,294) to Tokenlon,[54] where a token swap occurred resulting in the transfer of 55,248 USDT back to address **0x1eaa**.[55] Prior to this deposit of USDT, **0x1eaa** contained 25,427 USDT of unknown origin. Following the token swap, no additional transactions occurred in **0x1eaa** until approximately three hours after the token swap, when **0x1eaa** transferred 40,000 USDT to **Money Laundering Address B**.[56] Remaining in **0x1eaa** was 5.196 ETH

---

[52] **Dates:** June 4, 20024; June 7, 2024, **Amounts:** 11.848308 ETH; 6.181881 ETH, **Transaction hash IDs:** 0xa18c188414aa0dfbf0b4c2c386833a623bf49a814491606ba80943d27a974297; 0x951e6c566317683bf55a2ae25520cb8eed0cbfe64e1ac80498f021dd9fddf834.
[53] **Transaction hash ID:** 0x538cfa9a19adbd459b0a333770624bf65b578db68dbeae7055366e168beb0142.
[54] Tokenlon is a decentralized exchange that allows instantaneous token trades.
[55] **Transaction hash ID:** 0xf6af948318210e66bbd44161705ad2b0dc0d75415c50bb0f6eb4fb06267bf67b.
[56] **Transaction hash ID:** 0x939a25730d83967180e1e0a93635dc2c86de32781f78fa4a34f79557997b3f9f.

(approximately $19,146). (3.02 ETH of which was traceable to Victim 9) and 40,675 USDT (15,248 USDT of which was traceable to Victim 9).

89.    Prior to the deposit of 40,000 USDT into **Money Laundering Address B**, **Money Laundering Address B** contained 1,127,121 USDT, consisting of funds traceable to Victims 3, 5, 7, 10, 11, 12, and 13, and funds of unknown origin. The deposit from **0x1eaa** resulted in a balance of 1,167,120 USDT on June 8, 2024. Between June 8, 2024, and June 28, 2024, **Money Laundering Address B** received nine additional deposits, totaling 970,984 USDT, consisting of funds traceable to Victims 1, 2, 4, 14, and 15, and funds of unknown origin, resulting in a balance of 2,138,104 USDT.

90.    The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 1. *See supra* para. 47.

###    x.    *Trace of Proceeds from Victim 10 to Subject Address*

91.    The below illustration (Chart 3.10) shows the movement of ETH from Victim 10 to the **Subject Address**. Victim 10 reported that in or around October 2023, Victim 10 received an accidental text message from an unknown number. After Victim 10 responded, the unknown individual introduced himself as "Hui Xia," and moved the conversation to WhatsApp. Eventually, Hui offered Victim 10 investment advice, and convinced Victim 10 to invest in a company called "xtb-online.vip." Approximately one month after Victim 10 began investing, Hui informed Victim 10 that the company had been renamed and the new website on

which Victim 10 could see her investments was "tpmtpo.com." Between March 2024 and May 2024, Victim 10 reported losing approximately $1.2 million to this scam using her Coinbase account and bank wire. A review of the blockchain confirms Victim 10 lost at least $883,262 in this scam. One of Victim 10's deposits to xtb-online.vip is traceable to the **Subject Address**.

**Chart 3.10.**



92.    On April 5, 2024, Victim 10 transferred 51.60778 ETH (approximately $171,018) from her Coinbase.com account to her own un-hosted wallet. Ten minutes later, Victim 10 transferred 51.6069 ETH to **0x384da1f8a5b741eb3cb8991d279dc5571219376a**, ("**0x384da1**").

93.    Prior to receiving the ETH from Victim 10's wallet, **0x384da1** contained .011 ETH (approximately $36.45). Five minutes after receiving the 51.6069 ETH, **0x384da1** transferred 51.6 ETH to Tokenlon, where a token swap occurred resulting in the transfer of 170,667 USDT back to **0x384da1**.

Approximately 11 minutes after the token swap, **0x384da1** transferred 170,000 USDT to **0x453323976b688df2699acdac18cbc862bd0b3b48** ("**0x45332**"), leaving behind 667 USDT traceable to Victim 10 in **0x384da1**.[57]

94.    Prior to the deposit of Victim 10's 170,000 USDT, **0x45332** contained 225,174 USDT of unknown origin, a portion of which was attributed by a blockchain analysis company to funds related to the same xtb-online.vip scam. Then, between April 6, 2024, and April 19, 2024, **0x45332** received a total of 43,000 USDT[58] and transferred 30,000 USDT back to **0x384da1**, resulting in a balance of 408,174 USDT in **0x45332** on April 19, 2024. No additional transactions occurred in **0x45332** until April 27, 2024, when **0x45332** transferred 100,000 USDT to **0x6522ec13371961f1690158ad3a6bdf8f68da6753**, ("**0x6522**"), leaving behind 308,174 USDT (70,000 USDT of which was traceable to Victim 10).[59]

95.    Prior to receiving the 100,000 USDT, **0x6522** contained 7,134 USDT. No additional transactions occurred in **0x6522** until approximately 90 minutes following the receipt of the 100,000 USDT, when **0x6522** transferred 81,290 USDT **0xc4abd5840c7ba2ca6d36ddb2c2f39dad1e66a616** ("**0xc4ab**"), leaving behind 18,710 USDT (all of which was traceable to Victim 10).[60]

96.    Prior to receiving the 81,290 USDT, **0xc4ab** was virtually empty. After the receipt of the 81,290, **0xc4ab** received 30,000 USDT of unknown origin. No

---

[57] **Transaction hash ID:** 0xf64895cca7f988086a5401ec7c2f6a9cce97d7c2a4f964acaa57c9c7a1d7e546.
[58] Of this 43,000 USDT, 15,000 USDT came from the same prior address - **0x384da1**.
[59] **Transaction hash ID:** 0x5daaa5025664ad957c29e7548dbae7f5873b9529da3c091ed12b00627f79a12f.
[60] **Transaction hash ID:** 0xa741cc35e89afd303dbefb3d3147608931f8a67a5d4ac812c7915451209120ed.

additional transactions occurred in **0xc4ab** until April 28, 2024, when **0xc4ab** transferred 110,000 USDT (81,290 USDT of which was directly traceable to Victim 10) to **0xd898a0cf36d360d6cfacfb1d34fe0f679041720b** ("**0xd898**"), leaving behind 1,290 USDT.[61]

97.    Prior to receiving the 110,000 USDT, **0xd898** contained 117 USDT. Between April 28, 2024, and May 12, 2024, **0xd898** received 44,500 USDT of unknown origin, and transferred a total of 62,081 USDT of unknown origin to **Money Laundering Address A** and an unrelated address on the Ethereum blockchain, resulting in a balance of 92,536 USDT in **0xd898** (81,290 USDT of which is directly traceable to Victim 10) on May 12, 2024. No additional transactions occurred in **0xd898** until May 30, 2024, when **0xd898** transferred 55,020 USDT (all of which is directly traceable to Victim 10) to **0x4171c0af87799ad6155d8a7205e92d7739b0c998** ("**Consolidation Address C**"), leaving a balance of 37,516 USDT (26,270 USDT of which is directly traceable to Victim 10).[62]

98.    Prior to receiving the 55,020 USDT, **Consolidation Address C** was empty. After the receipt of the 55,020 USDT, no transactions occurred until the following day, May 31, 2024, when **Consolidation Address C** transferred 50,000 USDT (all of which is directly traceable to Victim 10) to

---

[61] **Transaction hash ID:** 0x2ee67fa050a3e4de71e912d8c6f988b7a13ff690ebea4b31ccf25291c05d4d44.
[62] **Transaction hash ID:** 0xe7acc85f3763d8db09bf488f8e104188240f40531740c06b35544a9df7307ba1.

**0x390698c7fd944a3b52e11da011df3d000cb87ef8**, ("**0x3906**"), leaving a balance of 5,020 USDT (directly traceable to Victim 10).[63]

99.    Prior to receiving the 50,000 USDT, **0x3906** contained 90,000 USDT of unknown origin. Following the 50,000 USDT deposit, no additional USDT transactions occurred in **0x3906** until June 1, 2024, when **0x3906** transferred its entire balance (140,000 USDT, 50,000 of which is directly traceable to Victim 10) to **0x694ddfdd51100e779ca1ed9baf9fed559fb32c4f**, ("**0x694d**").[64]

100.    Prior to receiving the 140,000 USDT, **0x694d** contained 2,548 USDT. Following the 140,000 USDT deposit, no other USDT transactions occurred in **0x694d** until June 6, 2024, when **0x694d** transferred 50,000 USDT (all of which is directly traced to Victim 10) to **Consolidation Address C**.

101.    Prior to receiving the 50,000 USDT, **Consolidation Address C** was empty.[65] Following the 50,000 USDT deposit, on June 7, 2024, **Consolidation Address C** received a total of 12,970 USDT of unknown origin, resulting in a balance of 62,970 USDT (50,000 of which is directly traced to Victim 10). No additional transactions occurred in **Consolidation Address C** until June 8, 2024, when **Consolidation Address C** transferred its entire balance to **Money Laundering Address B**.[66]

---

[63] **Transaction hash ID:** 0x9a3a41f5252c0198cb2d98e0c9478927fe1087b48aeb222562159548fb54857d.
[64] **Transaction hash ID:** 0x5a0e6a3fb8402d8869a2727b1e38574e7b5046344e9a7082d1e74af1258ed3e7.
[65] Between May 31, 2024, and June 6, 2024, **Consolidation Address C** transferred out the 5,020 referenced above in paragraph 91.
[66] **Transaction hash ID:** 0x48af3f62fc872bcc2e6e8f5b80157b2cb3ee2181caa06fb49dba835f207f6803.

102.    Prior to receiving the 62,970 USDT from **Consolidation Address C**, **Money Laundering Address B** contained 1,064,150 USDT, which consisted of funds traceable to Victims 3, 5, 7, 11, 12, and 13.  Following the deposit of the 62,970 USDT, **Money Laundering Address B** received an additional ten deposits, totaling 1,010,984, consisting of funds traceable to Victims 1, 2, 4, 9, 14, and 15, resulting in a balance of 2,138,104 USDT.

103.    The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 1. *See supra* para. 47.

### xi.    *Trace of Proceeds from Victim 11 to Subject Address*

104.    The below illustration (Chart 3.11) shows the movement of ETH from Victim 11 to the **Subject Address**. Victim 11 reported that he was contacted by an unknown number via text message on the Line[67] application. This unknown individual suggested that Victim 12 look into a cryptocurrency investment opportunity called worldmax.com. Victim 12 reported that he conducted research into the investment site online and was convinced it was legitimate. Victim 12 reported that between May 13, 2024, and June 18, 2024, he deposited approximately $250,000 to an address provided by the unknown individual. Kraken records confirm Victim 12 sent at least $93,000 to an address associated with the scam. One of Victim 12's deposits is traceable to the **Subject Address**.

---

[67] Line is a messaging application that offers free voice and video calls as well as text messaging.

**Chart 3.11**



105.    On June 3, 2024, Victim 11 sent 9.062 ETH (approximately $34,068) from his Kraken account to his own un-hosted wallet. Less than one minute later, Victim 11 sent 9.061 ETH, from his un-hosted wallet to an address provided by worldmax.com – **0x1c8c8593369f82edf30818f423ba4bcd19780871**, ("**0x1c8c85**").[68] Prior to receiving the 9.061 ETH, **0x1c8c85** was virtually empty. Five hours after receiving the 9.061 ETH on June 3, 2024, **0x1c8c85** received 2.129 ETH (approximately $8,005) from an unrelated address on the Ethereum blockchain, resulting in a balance of 11.19 ETH (approximately $42,069). No additional transactions occurred in **0x1c8c85** until the following day, June 4, 2024, when **0x1c8c85** transferred 11 ETH (approximately $41,359) (9.061 ETH of which is

---

[68] **Transaction hash ID:** 0x85798606566dce3175d0ec131fda750929a2c671452cccbee10434ad622827fb.

traced to Victim 11) to **0xafcf3dfb5bb5d810b1ef9b34de307e57382e7e5d** ("**0xafc3d**").[69]

106.    Prior to receiving the 11 ETH, **0xafc3d** contained 0.631 ETH of unknown origin and 557 USDT traceable to Victim 11 from a prior transaction. One hour after receiving the 11 ETH, **0xafc3d** transferred 11.5 ETH (approximately $43,810) to Tokenlon, where a token swap occurred, resulting in the transfer of 42,944 USDT (33,836 of which is traceable to Victim 11) back to **0xafc3d**, resulting in a USDT balance of 43,502 USDT (34,393 of which is directly traceable to Victim 11). On that same day, **0xafc3d** transferred 41,666 USDT (34,393 of which is directly traceable to Victim 11) to **Consolidation Address C**.[70]

107.    Prior to receiving the 41,666 USDT, on June 4, 2024, **Consolidation Address C** contained 28,000 USDT consisting of funds traceable to a victim of a different wire fraud scam according to a blockchain analysis software, and funds of unknown origin. Following the receipt of the 41,666 USDT, **Consolidation Address C** transferred 35,004 USDT to an unrelated address on the Ethereum blockchain, leaving **Consolidation Address C** with a balance of 34,662 USDT (34,393 of which is traceable to Victim 11).  On June 6, 2024, **Consolidation Address C** transferred its remaining USDT balance (34,662 USDT) to **Money Laundering Address B**.[71]

---

[69] **Transaction hash ID:** 0x9c9f93d339035de7a4bab1f390c2badb07e8f92de8ff7bd2df5187190dc90b50.
[70] **Transaction hash ID:** 0x0befd7b3ffa3a41a259296143060dd98ede36ff6e2166e504d2b7812c33a16c5.
[71] **Transaction hash ID:** 0x24c3e7efe169dd1dd9292b4aaa7b0ab6db8aea11575f36521fbcecad61eb896e.

108.   Prior to receiving the 34,662 USDT, on June 6, 2024, **Money Laundering Address B** contained 1,035,688 USDT, consisting of funds traceable to Victims 3, 5, 7, 12, and 13, and funds of unknown origin. Following the receipt of the 34,662, **Money Laundering Address B** contained a balance of 1,070,350 USDT. On June 7, 2024, **Money Laundering Address B** transferred 6,199 USDT to an unrelated address on the Ethereum blockchain, resulting in a balance of 1,064,151 USDT. Between June 8, 2024, and June 26, 2024, **Money Laundering Address B** received an additional 11 deposits, totaling 1,073,953 USDT, consisting of funds traceable to Victims 1, 2, 4, 9, 10, 14, and 15, and funds of unknown origin, resulting in a balance of 2,138,104 USDT.

109.   The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 1. *See supra* para. 47.

### xii.   *Trace of Proceeds from Victim 12 to Subject Address*

110.   The below illustration (Chart 3.12) shows the movement of USDT from Victim 12 to the **Subject Address**. Victim 12 reported that in or around May 2024, Victim 12 received a purported accidental text message from an unknown number. The individual behind the unknown number identified herself as "Nina."  After cordial conversation, Victim 12 developed what he believed to be a friendship with Nina. Eventually, Nina convinced Victim 12 to open an account at Crypto.com and send money to cofglobol.com, with the promise of a high rate of return on his investment. On May 14, 2024, and May 24, 2024, Victim 12 sent $20,000 across two

transactions from his Crypto.com account to an address associated with the cofglobol.com scam. Both of those transactions are traceable to the **Subject Address**.

**Chart 3.12.**



111.    On May 14, 2024, and May 24, 2024, Victim 12 conducted two transactions to transfer approximately 19,513 USDT from his Crypto.com account to an address provided by the cofglobol.com scam – **0x21b3e3bbe04bf9caa81980dccc3759ab4bfa7c1a** ("**0x21b3e3**").[72] Within less than 20 minutes of each transaction, **0x21b3e3** transferred the exact amounts to address **Consolidation Address A**.

---

[72] **Dates:** May 14, 2024; May 24, 2024.
**Amounts:** 4,877 USDT; 14,636 USDT.
**Transaction hash IDs:** 0x69d69ac7a8528fbd92d803897deeb00e6b9a4ffb9c5b725d6b72090e2c4673dc; 0x5c760576386c12a8256c5ca177e10ca33af82ecde82161da7ea6a56f72ae5638.

112.    Prior to receiving the first of the two deposits, on May 14, 2024, **Consolidation Address A** contained 61,717 USDT, consisting of funds traceable to Victim 3 and funds of unknown origin. Following the receipt of the first deposit traceable to Victim 12 (4,877 USDT) between May 17, 2024, and May 23, 2024, **Consolidation Address A** received five deposits consisting of funds traceable to Victim 7, and funds of unknown origin, totaling 66,963 USDT. Then on May 24, 2024, **Consolidation Address A** received the second of the two deposits traceable to Victim 12 (14,636 USDT), resulting in a balance of 148,193 USDT.

113.    The remaining trace of relevant funds to the **Subject Address** is detailed above in the trace of funds belonging to Victim 7. *See supra* paras. 75-77.

### xiii.    *Trace of Proceeds from Victim 13 to Subject Address*

114.    The below illustration (Chart 3.13) shows the movement of USDT from Victim 13 to the **Subject Address**. Victim 13 reported that in or around March 2024, he received a purported accidental text message from an unknown number. The unknown party introduced herself as "Katie Chu."  After additional conversation with Katie, Katie convinced Victim 13 to invest in cryptocurrency through the website "cofglobol.com." Between April 2024 and May 2024, Victim 13 conducted four transactions, totaling approximately $46,050, via his Kraken account to the cofglobol.com scam. One of Victim 13's transactions is traceable to the **Subject Address**.

**Chart 3.13**



115.    On April 25, 2024, Victim 13 sent 21,305 USDT from his Kraken

account to **0xe218cfab152c9ab99c3ae70a3acd4d35ca7b0168** ("**0xe218**").[73] Prior to

receiving the 21,305 USDT, **0xe218** was empty. Following the receipt of the 21,305

USDT, no transactions occurred in **0xe218** until May 1, 2024, when **0xe218**

transferred the 21,305 to **Consolidation Address B**.[74]

116.    Prior to receiving the 21,305 USDT on May 1, 2024, **Consolidation**

**Address B** was empty. After receiving the 21,305 USDT, still on May 1, 2024,

**Consolidation Address B** received eight additional deposits totaling 209,813 USDT

of unknown origin, resulting in a balance of 231,118 USDT. On May 3, 2024,

---

[73] **Transaction hash ID:** 0x52de0fe0f30582bbee71a316bab46a03559f21f285c27653bf6a54c9439e3605.
[74] **Transaction hash ID:** 0x728f50b91f0d52743b3d0f760301cd40d4043250da3ffa392ac466afdfdbab24.

**Consolidation Address B** transferred 209,025 USDT to **Money Laundering Address A**, leaving 22,093 USDT (21,305 of which is traceable to Victim 13) in **Consolidation Address B**. Between May 3, 2024, and May 9, 2024, **Consolidation Address B** received an additional nine deposits totaling 138,233 USDT of unknown origin, resulting in a balance of 160,326 USDT. Between May 13, 2024, and May 17, 2024, **Consolidation Address B** transferred 147,347 USDT to unrelated addresses on the Ethereum blockchain, leaving 12,979 USDT (all of which is traceable to Victim 13) in **Consolidation Address B**. On May 29, 2024, **Consolidation Address B** received 106,113 USDT of unknown origin. Less than 10 minutes later, **Consolidation Address B** transferred 100,000 USDT to an unrelated address on the Ethereum blockchain, leaving **Consolidation Address B** with a balance of 19,092 USDT (12,979 of which is traceable to Victim 13). On June 4, 2024, **Consolidation Address B** received 13 deposits totaling 294,800 USDT, consisting of funds traceable to Victims 3, 5, 7, and 12, and funds of unknown origin, resulting in a balance of 313,892 USDT.

117.    The remaining trace of relevant funds to the **Subject Address** is detailed above in the trace of funds belonging to Victim 3. *See supra* paras. 55-57.

***xiv.***    ***Trace of Proceeds from Victim 14 to Subject Address***

118.    The below illustration (Chart 3.14) shows the movement of USDT from Victim 14 to the Subject Address. Victim 14 reported that in or around January 2024, Victim 15 received a purported accidental text message from an unknown number.

The individual using the unknown number identified herself as "Erin," and continued to chat with Victim 14. By February, Erin convinced Victim 14 to invest money through a website called xmdefi.net, where she promised he would receive a high rate of return on his investment. Erin also recommended that Victim 14 use a trust wallet from which to invest his cryptocurrency in the xmdefi.net platform, rather than sending money directly from his Crypto.com account. Crypto.com records confirm that between February 2024 and August 2024, Victim 15 sent approximately $205,000 through his Crypto.com account to the xmdefi.net scam. Two of Victim 14's deposits are traceable to the **Subject Address.**

**Chart 3.14**



119.    On May 24, 2024, Victim 14 transferred 19,521 USDT from his

Crypto.com account to an un-hosted trust wallet, also belonging to Victim 14. Less

than ten minutes later, Victim 14 transferred the same amount from his trust wallet

to **0x075ec4e361b7b372e8b9898432930cc39b66eff6 ("Consolidation Address**

**D")**.[75] Similarly on May 31, 2024, Victim 14 transferred 19,518 USDT from his

Crypto.com account to his trust wallet, and less than ten minutes later, sent the same

amount from his trust wallet to **Consolidation Address D**.[76]

120.    Prior to receiving the May 24, 2024, deposit from Victim 14,

**Consolidation Address D** contained 5,952 USDT of unknown origin. Following the

---

[75] **Transaction hash ID:** 0xbf1279172ce42d68a11e24daf30458ade23d4e8069cf1f542e402dff8c4333cb.
[76] **Transaction hash ID:** 0xec2a4f173c3954c8afbe6ef64e9a4670aa8e06413ff687d33aa5652bafb62732.

deposit of Victim 14's 19,521 USDT, on May 27, 2024, **Consolidation Address D** received 30,864 USDT of unknown origin. Between May 28, 2024, and May 29, 2024, **Consolidation Address D** transferred 46,082 USDT to an unrelated address on the Ethereum blockchain, leaving 10,255 USDT in **Consolidation Address D** (4,302 of which is traceable to Victim 14). No additional transactions occurred in **Consolidation Address D** until May 31, 2024, when **Consolidation Address D** received the second of Victim 14's deposits (19,518 USDT), described above. Between June 3, 2024, and June 5, 2024, **Consolidation Address D** received four deposits totaling 40,302 USDT, consisting of funds traceable to Victim 15 and funds of unknown origin, resulting in a balance of 70,075 USDT (23,820 of which is traceable to Victim 14, and 19,520 of which is traceable to Victim 15). No additional transactions occurred in **Consolidation Address D** until June 9, 2024, when **Consolidation Address D** transferred the entire balance (70,075 USDT) to **Money Laundering Address B**.[77]

121. Prior to receiving the 70,075 USDT on June 9, 2024, **Money Laundering Address B** contained 1,167,120 USDT consisting of funds traceable to Victims 3, 5, 7, 9, 10, 11, 12, and 13, and funds of unknown origin. Following the receipt of the 70,075 USDT, between June 17 and June 26, 2024, **Money Laundering Address B** received an additional eight deposits totaling 900,909 USDT,

---

[77] **Transaction hash ID:** 0x96807b52c8c182e568cc96e594c37ac465c534e74a3ad18ba73e7b4eab3fb679.

consisting of funds traceable to Victims 1, 2, and 4, and funds of unknown origin, resulting in a balance of 2,138,104.

122.    The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 1. *See supra* para. 47.

### xv.    *Trace of Proceeds from Victim 15 to Subject Address*

123.    The below illustration (Chart 3.15) shows the movement of USDT from Victim 15 to the **Subject Address**. Victim 15 reported that in or around March 2024, Victim 15 received an "accidental" text message from an unknown number. The individual using the unknown number identified herself as "Caroline Aksnes," and claimed she lived in Santa Monica, California. After additional conversation with Victim 15, in May 2024, Caroline convinced Victim 15 to invest his money in the cryptocurrency company, XM Defi, using "xmdefily.com." Records from Crypto.com confirmed that between May and Jun 2024, Victim 15 lost $45,000 to the XM Defi scam proposed by Caroline. One of Victim 15's transactions is directly traceable to the **Subject Address**.

**Chart 3.15**



124.    On June 5, 2024, Victim 15 transferred 19,518 USDT from his Crypto.com account to an un-hosted trust wallet, also belonging to Victim 15. Approximately ten minutes later, Victim 15 transferred the same amount from his trust wallet to **Consolidation Address D**.[78]

125.    Prior to receiving the 19,520 USDT, on June 5, 2024, **Consolidation Address D** contained 50,555 USDT consisting of funds traceable to Victim 14 and funds of unknown origin, resulting in a balance of 70,075 USDT.

126.    The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 14. *See supra* paras. 118-20.

---

[78] **Transaction hash ID:** 0xd2b8cf2ba0cd8c82fc47e39ac46b98a470b8dcbc1114e58e1aa6152b2c3012dc.

### xvi.    Trace of Proceeds from Victim 16 to Subject Address

127.    The below illustration (Chart 3.16) shows the movement of USDT from Victim 16 to the **Subject Address**. Victim 16 reported that in or around January 2024, Victim 16 received a purported accidental text message from an unknown number. As a result of the accidental text message, Victim 16 and the unknown individual developed a friendship via text message. By February 2024, this individual convinced Victim 16 to invest in a cryptocurrency company called "XM Defi," using the website, xmdefily.com. Crypto.com records revealed that between February 2024 and April 2024, Victim 16 lost approximately $291,000 to this scam. One of Victim 16's deposits to XM Defi is traceable to the **Subject Address**.

**Chart 3.16**



128.  On April 16, 2024, Victim 16 transferred 49,984 USDT from his Crypto.com account to a suspected trust wallet controlled by Victim 16. Approximately ten minutes later, Victim 16 transferred the same amount from his trust wallet to **0xa8f2b9c691b26ee09803054c9c5c4cabadcff587** ("**0xa8f2b9**").[79]

129.  Prior to receiving the 49,984 USDT, on April 16, 2024, **0xa8f2b9** contained 46,324 USDT,[80] resulting in a balance of 96,308 USDT. Following the deposit of Victim 16's 49,984 USDT, on April 18, 2024, **0xa8f2b9** transferred 46,000 USDT to an unrelated address on the Ethereum blockchain, resulting in a balance of 50,308 USDT. No additional USDT transactions occurred in **0xa8f2b9** until May 29, 2024, when **0xa8f2b9** transferred the remaining balance to **0xa143c42c9857a466169d48a80411bba5cafbc635** ("**0xa143**").[81]

130.  On May 29, 2024, prior to receiving the 50,308 USDT, **0xa143** was empty and had not conducted any previous transactions. Following the receipt of the 50,308 USDT no USDT transactions occurred until May 30, 2024, when **0xa143** transferred the entire balance to **Money Laundering Address A**.[82]

131.  On May 30, 2024, prior to receiving the 50,308 USDT, **Money Laundering Address A** contained 1,168,878 USDT, consisting of funds traceable to Victim 6 and funds of unknown origin, resulting in a balance of 1,219,186 USDT. Between May 31 and June 27, 2024, after receiving the 50,308 USDT, **Money**

---

[79] **Transaction hash ID:** 0x9de95cce7420c028cae8097e6c408acbc4b8190328f3b1c2931d61f3bb95c12c.
[80] The 46,324 USDT was also traceable to Victim 16 from a prior deposit.
[81] **Transaction hash ID:** 0x51a5e8da4897cc886ec405060727b99542c9f27c5c47efadab0a3f9e0c6ed684.
[82] **Transaction hash ID:** 0xbbcc586721d1d66dd2304987c3e0726ad08136ece5ea6ff5e2fd90c3f0566428.

**Laundering Address A** received nine additional deposits totaling 1,343,243 USDT, consisting of funds traceable to Victim 8 and funds of unknown origin. During the same timeframe, **Money Laundering Address A** conducted eight transfers of funds of unknown origin to one unrelated address on the Ethereum blockchain, totaling approximately 196,820 USDT, resulting in a balance of approximately 2,365,608 USDT in **Money Laundering Address A**.

132.    The remaining trace of relevant funds into the **Subject Address** is detailed above in the trace of funds belonging to Victim 6. *See supra* para. 75.

### D.    Additional Analysis of Related Addresses

133.    The Financial Action Task Force (FATF), an independent intergovernmental body that develops and promotes policies to protect the global financial system against money laundering, has identified various "Red Flag Indicators" that allow investigators to identify money laundering conduct. The FATF has identified the following factors as indicators of money laundering conduct:

> a.    Making multiple high-value transactions in short succession, such as within a 24-hour period, in a staggered and regular pattern, with no further transactions recorded during a long period afterwards, to a newly created or to a previously inactive account;
>
> b.    Depositing virtual assets at an exchange and then often immediately exchanging the Virtual Assets (VAs) to other VAs, which is an unnecessary step and incurs transaction fees, or withdrawing the VAs from a virtual asset service provider (VASP) account immediately to a private wallet, which conduct

effectively turns the exchange/VASP into an ML mixer; and

c.    Accepting funds suspected as stolen or fraudulent and depositing funds from addresses linked to the holders of stolen funds.[83]

134.    Multiple related wallet addresses operating on the Ethereum blockchain demonstrated unique characteristics and transaction behaviors that have been recognized by the FATF as indicators of money laundering. Several addresses through which victim funds passed engaged in high-value transactions in rapid succession, while comingling proceeds from multiple victims within a 24-hour period following the initial victim deposit. While this specific pattern was not directly observed in the transactions described herein (which only consists of the transactions of victim funds leading to the **Subject Address**), this behavior was observed in addresses through which funds from Victims 1, 3 through 11, and 14 through 16, traversed.

135.    FATF further recognizes the practice of depositing virtual assets into a VASP—such as a cryptocurrency exchange—and then immediately withdrawing those assets to privately controlled wallets, as indicative of money laundering. This tactic effectively uses the VASP as an unintentional mixing service, complicating the traceability of funds. This behavior was identified in the complete transaction histories of funds belonging to Victims 1, 5 through 11, 13, 14, and 16. In these instances, funds passed through exchanges including Binance, OKX, and Huobi

---

[83] Financial Action Task Force, *Virtual Assets Red Flag Indicators*, (September 2020), available at https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Virtual-Assets-Red-Flag-Indicators.pdf.coredownload.pdf at 5, 11.

Global, and were subsequently withdrawn to addresses on the TRON blockchain or other external blockchains.

136.    Another red flag present in this investigation, and identified by FATF, involves blockchain addresses that receive incoming transactions in relatively small amounts from numerous unrelated wallets. These addresses subsequently consolidate and transfer the accumulated funds to other addresses or exchanges, or in some cases, convert them to fiat currency. This activity was observed in the traces associated with funds originating from Victims 3, 5, 7, and 10 through 15. Specifically, the following Ethereum addresses demonstrated this behavior: **Consolidation Address A**, **Consolidation Address B**, **Consolidation Address C**, **Consolidation Address D**, and **0x438499b6e312231b2b29b20df5ab33426ccc02cf**, ("**Consolidation Address E**"). These addresses were used to pool proceeds traceable to multiple victims of fraud, which were then transferred out in larger transactions to additional addresses on the blockchain. Such behavior is consistent with common layering techniques used to obscure the origin of illicit funds.

### i.    *Money Laundering Indicators Present in Consolidation Addresses*

137.    **Consolidation Address A** appears in the traces of funds belonging to Victims 3, 7, and 12, receiving a total of 117,813 USDT in victim funds. This address first became active on the blockchain on February 7, 2024, when it began receiving USDC, Ether, and USDT directly from various VASPs. According to a blockchain analysis company, these incoming transfers are suspected to include deposits from

unidentified victims. The address typically held the funds for a day or two before transferring most of the value to other blockchain addresses. Starting in May 2024, USDT traceable to Victims 3, 7, and 12 began accumulating in this address. **Consolidation Address A** later moved and combined these funds into **Consolidation Address B.**

138.    **Consolidation Address B** appears in the traces of funds belonging to Victims 3, 5, 7, 12, and 13, receiving a total of 263,620 USDT relating to the victims. Activity at this address began in May 2024, starting with funds linked to Victim 13. Between May 1 and July 3, 2024, **Consolidation Address B** executed five separate series of transactions, each involving the consolidation of smaller USDT deposits followed by a single large outbound transfer that nearly emptied the address. Two of the known destinations for these large USDT transfers were **Money Laundering Address A** and **Money Laundering Address B.** The below illustration (Chart 4) shows the relationship between **Consolidation Addresses A and B**, and **Money Laundering Addresses A and B**.

**Chart 4.**



139.    **Consolidation Address C** appeared in the fund traces of Victims 10 and

11, receiving approximately 124,686 USDT. This address was first activated on the

blockchain on May 20, 2024, when it began receiving primarily USDT from multiple

seemingly unrelated addresses. A review of transactions shows that a few unrelated

wallets deposited funds into **Consolidation Address C**, and within 24 hours, those

funds were typically split and transferred out to other addresses on the blockchain. In

the trace related to Victim 10, there is evidence of a circular movement of funds:

USDT left **Consolidation Address C**, passed through two other blockchain

addresses, and then returned to the original address approximately seven days later.

This type of unnecessary movement is a common laundering tactic, designed to

obscure the origin of funds and create the appearance of legitimate investment

activity because the funds returned to the consolidation address but with what appear to be gains. The below illustration (Chart 5) shows the above-described relationships.

**Chart 5.**



140. **Consolidation Address D** appears in the fund traces of Victims 1, 14, and 15, receiving approximately 58,745 USDT directly traceable to Victims 14 and 15. Additional funds from Victim 1 were also consolidated at this address before being transferred to **Consolidation Addresses C and E**, and subsequently sent to a VASP. This address first appeared on the blockchain in November 2023. Between December 28, 2023, and June 9, 2024, it executed 13 sets of transactions, each involving the aggregation of smaller USDT deposits followed by a single large outbound transfer that nearly emptied the address. Of those 13 large transfers, ten were sent to the following known destinations: **Money Laundering Addresses A and**

**B, and Consolidation Addresses C and E.** These described movement patterns are consistent with common money laundering techniques, in which illicit funds are consolidated and moved in large, coordinated batches to further obscure their origin. The below illustration (Chart 6) shows the above-described relationships.

**Chart 6.**



141.    **Consolidation Address E**, while not directly linked to the **Subject Address**, plays a central and strategic role in the broader laundering scheme connected to this criminal organization. It is a common destination for funds originating from both known and unidentified victims, serving as a critical aggregation point before assets are moved directly and indirectly to VASPs. Between October 2023 and January 2025, **Consolidation Address E** processed approximately 21,000,000 USDT in suspected illicit funds. Of that total, about 15,800,000 USDT was ultimately sent to Binance, either directly or through intermediary addresses,

suggesting the address was heavily used for preparing stolen assets for conversion into fiat or further obfuscation.

142.    **Consolidation Address E** received the following amounts from multiple addresses related to this investigation: 90,000 USDT from **Consolidation Address C**, (tied to Victims 10 and 11); 98,000 USDT from **Consolidation Address D** (tied to Victims 1, 14, and 15); 2,500,000 USDT from **Money Laundering Address A**; and 623,000 from **Money Laundering Address B**. These incoming transfers were not isolated, but rather reflect a deliberate laundering system in which victim funds are first split and routed through initial layers of consolidation (**Consolidation Addresses A–D**), and then funneled into **Consolidation Address E** for bulk consolidation and transfer to a foreign VASP.

143.    This behavior shows a multi-leveled money laundering operation, where **Consolidation Address E** functions as a final staging area prior to integration. Its ability to draw from various laundering addresses and consolidate large volumes of USDT for withdrawing supports its importance as a critical address within this money laundering network. The presence of these FATF red flags, when considered collectively, strongly suggests that the blockchain activity in question is indicative of a coordinated money laundering operation designed to obscure the source and ownership of victim funds. The below illustration (Chart 7) depicts the overall relationship between the known Victim funds, **Consolidation Addresses, Money Laundering Addresses,** and the **Subject Address.**

**Chart 7.**



*ii. Money Laundering Indicators Present in Money Laundering Addresses*

144.  **Money Laundering Address A** was first seen on the Ethereum blockchain on July 25, 2023. The last transaction conducted in the address occurred on October 2, 2024.  A review of transactions that occurred was conducted by USSS, which revealed the following information. **Money Laundering Address A** received 261 credits totaling approximately $21,938,000.  Of the total credits to the address, approximately $10,982,000 has been directly attributed by a blockchain analysis company to wire fraud scams. During the same time, approximately $8,647,000 was credited to **Money Laundering Address A** from known VASPs. Many of the transcontinental scamming organizations conduct transactions of illicit financial gains through VASPs to obfuscate the true origin of the funds.

145.    **Money Laundering Address A** transacted 465 debits totaling approximately $21,279,000. Of the total debits from the address, approximately $4,135,000 was sent to a VASP to either withdraw the profits or conduct transactions through the VASP to obfuscate the origin of the funds. Approximately $7,083,000 of assets were sent to addresses that have been attributed by a blockchain analysis company as being associated with a wire fraud scam.

146.    **Money Laundering Address B** was first seen on the Ethereum blockchain on April 4, 2024.  The last transaction conducted using **Money Laundering Address B** took place on October 4, 2024. USSS conducted a review of transactions in **Money Laundering Address B** between April 4, 2024, and October 4, 2024, revealing the following information. **Money Laundering Address B** received 70 credits worth approximately $7,494,000. Of the total credits to **Money Laundering Address B**, approximately $3,286,000 has been directly attributed by a blockchain analysis company to wire fraud scams. During the same time, approximately $2,813,000 was credited to the address that originated from known VASPs. Many of the transcontinental scamming organizations conduct transactions of illicit financial gains through VASPs to obfuscate the true origin of the funds.

147.    **Money Laundering Address B** transacted 105 debits from the address totaling approximately $7,473,000. Of the total debits from **Money Laundering Address B**, approximately $620,000 was sent to a VASP to either withdraw the profits or conduct transactions through the VASP to obfuscate the origin of the

funds. Approximately $3,033,000 was sent to addresses that exhibited transaction history like the consolidation addresses. Once received at these addresses, the funds were converted to another stable coin to obfuscate the source and origin of the fraud proceeds and to prevent law enforcement seizure.

148.    The characteristics of the transactions detailed above – the rapid transfer of funds, the movement of funds from the initial victim's accounts through intermediary addresses or hops, and the commingling of funds – are examples of a money laundering process known as "layering," in which the proceeds of the illicit activity are moved through two or more levels of transactions in an effort to conceal or disguise the nature, source, ownership, or control of the funds, and to make tracing the illicit funds more difficult.

149.    The movement of funds illustrated above in Charts 1 through 7, is indicative of an actor or actors intentionally trying to obfuscate the origin of the illicit funds. The patterns seen here, where various victims' funds pass through the same intermediary addresses that appear to be controlled by the same group of individuals, is indicative of money laundering. Furthermore, the activity of **Money Laundering Addresses A and B** above, include numerous incoming and outgoing transfers consisting of identified fraud scheme proceeds and funds from unknown sources.

### E.    Seizure of the Defendant Funds

150.    On or about July 1, 2025, the USSS executed a Federal seizure warrant for all USDT associated with the **Subject Address**, after this Court found probable cause that the funds constituted proceeds of a wire fraud scheme, in violation of 18 U.S.C. §§ 1343 and 1349, and property involved in money laundering offenses, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h). Upon execution of the seizure warrant, the USSS seized the **Defendant Funds** (approximately 4,110,000 USDT) associated with the **Subject Address**.

151.    As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the **Defendant Funds** are derived from proceeds of wire fraud, and also constitute property involved in money laundering violations.

## <u>CONCLUSION</u>

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff, United States of America requests that this Court initiate a process of forfeiture against the **Defendant Funds**, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed. The United States further requests the Court order

the **Defendant Funds** forfeited to the United States for disposition according to law and grant the United States such other and further relief as this case may require.

Dated: November 26, 2025          Respectfully Submitted,


GREGORY W. KEHOE
United States Attorney

By:  _____
JENNIFER M. HARRINGTON
Assistant United States Attorney
Florida Bar No. 0117748
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
(407) 648-7500 – telephone
(407) 648-7643 – facsimile
E-mail: Jennifer.Harrington2@usdoj.gov

**VERIFICATION**

I, Keith Harris, hereby verify and declare under penalty of perjury, that I am a Special Agent with the United States Secret Service, and pursuant to 28 U.S.C. § 1746: (1) I have read the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof; and (2) that the matters contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States Secret Service, as well as my investigation of this case together with other law enforcement agents. I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of November, 2025.

_____
Keith Harris
Special Agent
United States Secret Service